AO 91 (Rev. 11/11)  Criminal Complaint (approved by AUSA A.Reinitz)                    19-092

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Pennsylvania

| | |
|---|---|
| United States of America<br>v.<br>**AINSLEY HUNTER,**<br>a/k/a "D.D."<br>a/k/a "K.H."<br><br>_Defendant(s)_ | )<br>)<br>)   Case No.  19- 1333-M<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of     May 10, 2019 to August 6, 2019     in the county of          Bucks          in the

    Eastern      District of      Pennsylvania     , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 956 | Conspiracy to kill, kidnap, or maim persons in a foreign country |
| 42 U.S.C. § 408(a)(7)(B) | Social Security fraud |
| 18 U.S.C. § 1028A | Aggravated Identity Theft |

This criminal complaint is based on these facts:

See Attached Affidavit

☐ Continued on the attached sheet.

_____
_Complainant's signature_

Matthew Yaeger, Special Agent, FBI
_Printed name and title_

Sworn to before me and signed in my presence.

Date:     08/06/2019

_____
_Judge's signature_

City and state:            Philadelphia, PA            Honorable Linda K. Caracappa, U.S. Magistrate Judge
_Printed name and title_

**AFFIDAVIT IN SUPPORT OF COMPLAINT**

I, Matthew Yaeger, being duly sworn under oath and deposed, state the following:

**INTRODUCTION AND AGENT BACKGROUND**

  1.  I am a Special Agent with the Federal Bureau of Investigation ("FBI")

assigned to the Philadelphia, Pennsylvania Division.  I have been a Special Agent of the FBI for

more than 13 years.  I am currently assigned to the Philadelphia Violent Crime squad and have

been for approximately the past 5 years.  For the prior 5 years, I was assigned to the Organized

Crime squad.  For approximately 3.5 years prior to that, I was assigned to the Violent

Crimes/Major Offenders squad in the FBI's Milwaukee, Wisconsin Division.  In the course of

my work, I have investigated violations of federal law being committed by violent offenders and

criminal organizations, including murders, robberies, drug offenses, racketeering, gambling

offenses, firearms offenses, and money laundering offenses.

  2.  This is an investigation of a plot to murder individuals located in the

country of Jamaica, committed by AINSLEY HUNTER and others.  In summary, based on the

investigation to date, I believe there is probable cause that HUNTER (while inside the United

States) conspired with individuals in Canada and Jamaica to arrange for the murder of

individuals in Jamaica.  HUNTER has also committed an act within the jurisdiction of the

United States (specifically in the Eastern District of Pennsylvania) to effect an object of the

conspiracy, all in violation of 18 U.S.C. § 956(a)(1).[1]  In addition, I believe there is probable

---

[1] 18 U.S.C. § 956(a)(1) states: "Whoever, within the jurisdiction of the United States, conspires
with one or more other persons, regardless of where such other person or persons are located, to
commit at any place outside the United States an act that would constitute the offense of murder,

cause that HUNTER has committed and is continuing to commit social security fraud and aggravated identity theft, in violation of 42 U.S.C. § 408(a)(7)(B) and 18 U.S.C. § 1028A, respectively. I make this affidavit in support of a criminal complaint and arrest warrant charging AINSLEY HUNTER, date of birth in August 1969, with violations of the three aforementioned statutes.

        3.      This affidavit is based upon my personal knowledge, experience and investigation, as well as information relayed to me directly or through reports of other FBI agents and task force officers, law enforcement personnel from the Department of Homeland Security Investigations ("HSI"), law enforcement personnel from the Social Security Administration Office of the Inspector General ("SSA-OIG"), law enforcement personnel from the Royal Canadian Mounted Police ("RCMP"), law enforcement personnel from Jamaica's Major Organized Crime and Anti-Corruption Agency ("MOCA"), law enforcement personnel from Canada's Durham Regional Police Department ("DRPD"), and other law enforcement officers in the course of their official duties. Throughout this affidavit, reference will be made to "agents," referring to those federal, state and local law enforcement officers, and officers

---

kidnapping, or maiming if committed in the special maritime and territorial jurisdiction of the United States shall, if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy, be punished as provided in subsection (a)(2)." The CTS Model Jury Instruction sets the elements of this offense as: (1) That the defendant agreed with one or more persons to [murder] [kidnap] [maim] another person at a place outside the United States; (2) That the defendant willfully joined the agreement with the intent to further its purpose; (3) That the defendant was within the jurisdiction of the United States when he conspired; and (4) That, during the existence of the agreement, one of the conspirators committed at least one overt act within the jurisdiction of the United States to effect any object of the agreement.

from RCMP, MOCA and DRPD, who have directly participated in the investigation, and with whom I have had regular contact. For simplicity, the plural form "agents" will be used throughout this affidavit, although some observations were made by only one agent.

4.      Because this affidavit is submitted for the limited purpose of obtaining a criminal complaint, I have not included all information known by me or other agents concerning this investigation. I have set forth only those facts I believe are essential to establish the probable cause to charge AINSLEY HUNTER with the aforementioned crimes. This affidavit does not exhaust my knowledge or that of other agents of the facts and circumstances surrounding this investigation.

## PROBABLE CAUSE

### Information from Confidential Informant 1

5.      Information in this affidavit is based, in part, on information provided by a confidential informant ("CI-1"). As will be explained below, the murder plot has been ongoing since at least early-to-mid May 2019. Between that time and May 24, 2019, CI-1 participated in the plot – CI-1 spoke with HUNTER and a co-conspirator (referred to in this affidavit as "SUSPECT 1") about the plot, received money from them, and represented himself to them as the person in Jamaica who would arrange for people to carry out the murders. CI-1 told HUNTER and SUSPECT 1 that he could arrange for off-duty police officers to commit the murders professionally. CI-1 stated that he only intended to string-along HUNTER and SUSPECT 1 and take their money, without ever actually arranging the murders. CI-1 stated he became concerned about HUNTER's connections and influence in Jamaica so, on May 24,

3

2019, CI-1 approached HSI in Jamaica with information about the murder plot. HSI began

investigating along with MOCA and RCMP. Since May 24, 2019, CI-1 has been interviewed

by HSI, MOCA, RCMP, DRPD and/or FBI personnel on multiple occasions and has conducted

consensually-recorded conversations with HUNTER and SUSPECT 1. I have been informed by

HSI and MOCA that, at the beginning of his cooperation with MOCA in late May 2019, CI-1

was advised that he may have criminal exposure as a result of his actions and no promises were

made regarding whether he will or will not be charged with a crime.[2] I have also been informed

that CI-1 has not previously been convicted of a crime in Jamaica.[3] Despite CI-1's actions prior

---

[2] On July 16, 2019, FBI and DRPD personnel advised CI-1 that no promises could be made regarding whether CI-1 would be charged with a crime. CI-1 was also advised that, as of that date, United States and Canadian law enforcement did not have jurisdiction to charge CI-1, and that Jamaican law enforcement would make any charging determinations. CI-1 was further advised that, as of that date, FBI and DRPD had been apprised that Jamaican law enforcement were not interested in charging him. However, the ultimate decision on whether to charge CI-1 will be made by the Jamaican authorities.

[3] MOCA and CI-1 have informed me that CI-1 was charged with crimes in Jamaica in 2008 and 2015. It is not believed that either charge resulted in a conviction. MOCA is attempting to confirm this, which can be a lengthy process because Jamaican criminal history records are not maintained in a national database similar to the United States. On July 28, 2019, I obtained a Jamaican civil court opinion regarding one of those cases and learned the following: law enforcement in Jamaica seized money from CI-1 (at the time, the equivalent of approximately $9,700 USD). Law enforcement alleged the money belonged to another person and was the proceeds of a crime committed by that person. CI-1 alleged that the money belonged to him and was the proceeds of a business he owned. Law enforcement sought to forfeit the money in a civil proceeding, pursuant to a statute that authorized seizure of the funds if law enforcement established reasonable grounds to believe CI-1 had committed a money laundering offense. The judge ruled for law enforcement. In the opinion, the judge reasoned that someone in CI-1's profession would normally exercise better security with such an amount of money, which led the judge to question CI-1's truthfulness.

to approaching law enforcement on May 24, 2019, and the information referenced in the preceding footnote, I believe CI-1's information to be truthful and reliable, as portions of it have been corroborated by consensually recorded phone calls, text messages, telephone records, surveillance video and physical surveillance, and CI-1 voluntarily provided information to law enforcement that opened himself to criminal exposure.

6.      The following is a summary of the information CI-1 provided to HSI, MOCA, RCMP, DRPD and FBI. This summary is based on an HSI written summary of some of the interviews, referenced in paragraph 5 above; an audio recording of an interview with CI-1 conducted by HSI and RCMP; a signed statement CI-1 provided to MOCA (and a recording of that interview); an interview I participated in with CI-1; and verbal summaries of other interviews provided to me by law enforcement personnel in Jamaica.[4]

7.      In approximately April 2019, CI-1's uncle told CI-1 about a friend of his in Canada. (The friend in Canada is SUSPECT 1. CI-1 only knew SUSPECT 1 by a nickname, but agents have identified SUSPECT 1's true name.) SUSPECT 1 told CI-1's uncle that he had

---

[4] In this affidavit, I endeavor to lay out an overall summary of the information CI-1 has provided across multiple interviews, as opposed to a description of what was discussed in each interview. CI-1's statements are largely consistent throughout the materials I have reviewed. Some matters are discussed in one interview, but not in another. In some instances, there are differences between the statements; for example, in one interview CI-1 describes a conversation happening on May 11, and in another interview CI-1 describes it happening on May 12. Based on my training and experience, I consider these types of differences to be normal when interviewing a person multiple times about complex matters, especially when the activity being described spanned a lengthy time period (as opposed to happening in one incident). I do not consider these differences to indicate deception by CI-1.

5

a friend in the United States who was willing to pay 1 million Jamaican dollars ("JMD")[5] to

have a man and his wife killed (the intended male victim will hereinafter be referred to as

"Victim 1"). CI-1 and his uncle decided they would play along and take the money, but would

not actually kill anyone. CI-1 never met the subject in the United States, and does not know his

name. As discussed below, agents have determined that the man CI-1 communicated with in

furtherance of the plot to kill Victim 1 and his wife is AINSLEY HUNTER. For clarity,

throughout this affidavit, the subject in the United States, although unknown to CI-1, will be

referred to as HUNTER.

        8.     CI-1's uncle did not mention the issue for a while. In early May, CI-1's

uncle stated that SUSPECT 1 was coming to Jamaica. On May 10, 2019, SUSPECT 1 traveled

from Canada to Jamaica.[6] CI-1's uncle picked up SUSPECT 1 at the airport in Kingston,

Jamaica. On May 11, 2019, CI-1 met with SUSPECT 1 and CI-1's uncle in Negril. SUSPECT

1 told CI-1 that HUNTER is from Jamaica and is a "Drugs Don" (i.e., a high-level drug dealer).

SUSPECT 1 also stated that he and HUNTER were in prison together and sold drugs together.

SUSPECT 1 stated that HUNTER had been in an accident and is now "crippled" and in a

---

[5] As of June 25, 2019, 1 million Jamaican dollars was equivalent to approximately $7,717
United States dollars.

[6] MOCA has confirmed that SUSPECT 1 entered Jamaica on May 10, 2019, and departed on
May 23, 2019.

wheelchair.[7]  SUSPECT 1 stated that HUNTER lives in California.  Regarding the intended victims in this case, SUSPECT 1 told CI-1 that they attended a particular church in Mount Salem, Jamaica every Thursday and Sunday.[8]

        9.      Over approximately the next 2 weeks, SUSPECT 1 remained in Jamaica. During that time, he communicated with CI-1 several times in person and by phone.[9]  Since the time of the first meeting with SUSPECT 1, CI-1 has had multiple conversations with SUSPECT 1 and HUNTER regarding the murder plot.  During his conversations with SUSPECT 1 (and later HUNTER), SUSPECT 1 and HUNTER told CI-1 that HUNTER wanted Victim 1 killed due to something that happened 2 years ago.  CI-1 never learned the specific reason why HUNTER wanted Victim 1 killed.  CI-1 created a ruse that he would use Jamaican police officers to carry out the murders of Victim 1 and his wife.  CI-1 told SUSPECT 1 (and later HUNTER) that the police officers would follow Victim 1 and his wife away from the church,

---

[7] During interviews with HSI, RCMP and MOCA in late May 2019, CI-1 stated that SUSPECT 1 told CI-1 that HUNTER was in a wheelchair.  During an interview on July 16, 2019, CI-1 told me that SUSPECT 1 stated that HUNTER was crippled, but did not mention a wheelchair.

[8] For reference, Victim 1's church is located in the western part of the island, in the Montego Bay area.  It is believed SUSPECT 1 was staying in Kingston while he was in Jamaica. Kingston is in the eastern part of the island and is approximately a 2.5 to 4 hour drive from Montego Bay.

[9] In the beginning of that time period, CI-1's uncle relayed messages between SUSPECT 1 and CI-1.  Later, CI-1 obtained SUSPECT 1's phone number and communicated with him directly. While SUSPECT 1 was in Jamaica, he used a Jamaican phone number to communicate with CI-1.  He used a different phone number after returning to Canada.

7

then conduct a traffic stop.  During the traffic stop, a separate car would arrive and carry out the murders.

      10.      On May 12, 2019, SUSPECT 1, CI-1 and CI-1's uncle went to Mount Salem to view the church that Victim 1 and his wife attended.

      11.      On May 14, 2019, CI-1's uncle sent CI-1 a WhatsApp message containing a photo of a male and two messages containing names – both had Victim 1's last name, with two possible first names.[10]  All three of these messages were labeled "Forwarded," indicating that CI-1's uncle likely forwarded messages he received from another person.  Prior to that, CI-1 had told his uncle to ask SUSPECT 1 for a photo of Victim 1.  Based on this chain of events, CI-1 believes SUSPECT 1 provided the photo and names to CI-1's uncle.[11]

      12.      Around this time, CI-1 told SUSPECT 1 he would need $100,000 JMD, in order for CI-1 to carry out background checks and for expenses to surveil the targets.  SUSPECT 1 told CI-1 that he would speak to HUNTER.[12]  On approximately May 16, 2019,

---

[10] WhatsApp is an encrypted messaging application owned by Facebook.  WhatsApp allows users to send text messages and voice messages, make voice and video calls, and share images, among other features.  Traditional phone calls and text messages are sent using a cellular provider's cellular service, whereas WhatsApp communications are transmitted using Wi-Fi or cellular data networks.  Cell phone coverage in Jamaica is inconsistent, often leading to poor reception or dropped calls.  Therefore, WhatsApp is a popular form of communication for people in Jamaica.

[11] CI-1 believed he received these messages on May 13, 2019.  Based on a review of CI-1's phone, CI-1 actually received the messages on May 14, 2019.

[12] According to CI-1, SUSPECT 1 had told CI-1's uncle that SUSPECT 1 and HUNTER had someone else waiting in line to commit the murders who wanted $2,000 USD just to identify the

SUSPECT 1 arranged to meet with CI-1 and CI-1's uncle at a bar in Montego Bay. At the bar, SUSPECT 1 handed CI-1 $100,000 JMD in cash.

13.     On approximately May 16 or May 17, 2019, CI-1 told SUSPECT 1 that CI-1 had gone to the church and identified Victim 1 (CI-1 stated he did not actually go to the church). CI-1 told SUSPECT 1 that he needed 50% of the 1 million JMD contract price (i.e., $500,000 JMD) to begin putting things in place to have people kill Victim 1 and his wife (CI-1 had already received $100,000 JMD from SUSPECT 1, so he expected to receive an additional $400,000). SUSPECT 1 told CI-1 that he would speak with HUNTER. On approximately May 20, 2019, CI-1 again asked SUSPECT 1 about the 50% payment. SUSPECT 1 told CI-1 that he lost his passport and needed to get a new one from the Canadian Embassy in Kingston, so he would not have time to meet with CI-1 in Montego Bay before he left Jamaica. SUSPECT 1 stated he would give CI-1's phone number to HUNTER so they could communicate directly.

14.     On May 21, 2019, CI-1 received a call from HUNTER, who was using a phone number with a 267 area code, the full number of which is known to agents (hereinafter referred to as the "SUBJECT PHONE").[13] HUNTER had a Jamaican male voice. HUNTER told CI-1 that he wanted the murders committed professionally and clean. HUNTER stated he knew people in Jamaica who could commit the murders, but were not professional. HUNTER

_____

victims. Therefore, CI-1 and his uncle believed SUSPECT 1 and HUNTER would be willing to pay $100,000 JMD (a little more than $700 USD).

[13] Phone records for the SUBJECT PHONE and CI-1's phone confirm that they had contact on May 21, 2019. The records currently available do not list a call from the SUBJECT PHONE to CI-1 on that date; the records indicate that the initial call was from CI-1 to HUNTER.

stated that he was using a "burner" phone, which CI-1 understood to mean an untraceable phone.[14] HUNTER told CI-1 that he would make arrangements for CI-1 to collect the remaining $400,000 JMD the following day.

15. On May 22, 2019, HUNTER called CI-1 and told him that the remaining $400,000 was ready. CI-1 and HUNTER arranged for the money to be collected at a Kentucky Fried Chicken ("KFC") in Montego Bay, Jamaica. CI-1 told HUNTER that CI-1 would be sending an associate to collect the money, and that the person would ask for a specified code word.[15] In reality, CI-1 did not plan to send an associate; he only wanted HUNTER to believe that the person collecting the money was not CI-1. CI-1 subsequently went to the KFC and met with an unidentified male (UNSUB 2), who asked CI-1 for the code word. CI-1 provided the code word. UNSUB 2 then used his phone to call someone and handed the phone to CI-1. The person on the phone asked CI-1 for the code word again, which CI-1 repeated. CI-1 recognized the voice on the phone as HUNTER. CI-1 handed the phone back to UNSUB 2, who spoke with HUNTER before ending the conversation. CI-1 then followed UNSUB 2 into a bathroom at the KFC, where UNSUB 2 placed the money inside a bathroom stall. CI-1 went into the stall and

---

[14] Based on my training and experience, I know the term "burner phone" to be a reference to a phone that (1) is difficult to connect to a particular user; and/or (2) is used to speak with certain people or about certain topics (often illegal activity) that the user does not want connected to his/her normal phone. Often these phones are prepaid phones with false or non-existent subscriber data.

[15] HSI's summary of the initial interview with CI-1 indicates that HUNTER suggested the code word, whereas the other materials I have reviewed indicate CI-1 suggested it.

collected the money, which totaled $400,000 JMD.[16] CI-1 later called HUNTER to let him know that CI-1 had received the money. CI-1 stated that this incident happened between approximately 4:00 p.m. and 5:00 p.m. Jamaica time.[17]

      16.     SUSPECT 1 left Jamaica on Thursday May 23, 2019. Around this time, CI-1 decided to contact law enforcement. CI-1 was concerned that: (1) CI-1 and his uncle could be in danger for taking HUNTER's money, because HUNTER told CI-1 he had connections in Jamaica; and (2) HUNTER and SUSPECT 1 could find other people to kill Victim 1.

      17.     On Friday May 24, 2019, CI-1 met with HSI in Kingston, Jamaica about the murder plot. After meeting with HSI, CI-1 went to Victim 1's church in Montego Bay and recorded videos inside. CI-1 wanted to use the videos to give himself more time to work with law enforcement because, in an effort to sound convincing to HUNTER and SUSPECT 1, CI-1 had previously suggested that the weekend of May 24 to May 26 would be a good time to carry out the murders. On Saturday May 25, 2019, CI-1's uncle sent him SUSPECT 1's Canadian cell phone number.[18] CI-1 sent the videos from the church to SUSPECT 1's Canadian phone

---

[16] CI-1 told law enforcement that he spent most of the money he received from SUSPECT 1 on May 16 or May 17 and from UNSUB 2 on May 22 for bills and personal expenses. CI-1 also gave portions of the money to his uncle and to other people.

[17] MOCA obtained surveillance video from the KFC on May 22, 2019. MOCA has informed me that the video shows CI-1 meeting with an unknown male, then going into the bathroom with the unknown male before leaving. The video's time stamp indicates this occurred around 4:25 p.m. Jamaica time.

[18] In order to give himself more time to work with law enforcement, CI-1 told his uncle that he actually planned to commit the murders because he believed that they would be in danger otherwise.

11

number via WhatsApp. CI-1 did this in order to convince SUSPECT 1 and HUNTER that he was still working on the murder plot, and to stall for time. After sending the videos, CI-1 spoke with SUSPECT 1 and HUNTER, and told them that he needed a better photo of Victim 1. HUNTER told CI-1 to give him some time. A few hours later, SUSPECT 1 sent CI-1 a photo via WhatsApp, which depicted Victim 1 and other males inside a church. Shortly after sending the photo, SUSPECT 1 sent a voice note to CI-1 via WhatsApp. CI-1 took the voice note as a test of whether he knew what he was doing, so he circled Victim 1 in the photo and sent it back to SUSPECT 1.

      18.     Regarding the photo CI-1 received from SUSPECT 1 on May 25, 2019, I have reviewed the WhatsApp messages from CI-1's phone. The messages show that, on May 25, 2019 at 11:06 p.m. Jamaica time (1 hour behind Eastern time), SUSPECT 1 sent the photo of Victim 1 to CI-1. That photo was labeled "Forwarded," indicating that SUSPECT 1 likely received the photo from another person and forwarded it to CI-1. CI-1 believes that HUNTER obtained the photo by viewing videos on the church's Facebook page and taking a screenshot of Victim 1.[19] At some point, HUNTER told CI-1 that he watches videos of the church on the internet, and that the photo was from around the January time frame. Based on the above, I

_____

[19] Agents have reviewed the publicly available Facebook page for Victim 1's church. The page contains multiple videos of prior church events. Agents have observed the same background in those videos that is visible in the photo sent to CI-1.

believe HUNTER was the person who sent or caused someone else to send the photo of Victim 1 to CI-1 (through SUSPECT 1).[20]

19.     CI-1 spoke with law enforcement again on multiple occasions during the week of May 27, 2019.  On May 31, 2019, CI-1 began conducting consensually recorded conversations with SUSPECT 1 and HUNTER.[21]  CI-1 has conducted the consensually recorded calls with HUNTER at the SUBJECT PHONE number.  At the direction of law enforcement, CI-1 has essentially been stalling HUNTER – i.e., CI-1 has led HUNTER to believe that the murders will happen, but have not been committed so far due to various circumstances.  I have reviewed transcripts of five calls between CI-1 and HUNTER that took place on June 2 and June 3, 2019 (one on June 2 and four on June 3).[22]  During all of the calls on June 2 and June 3, 2019, the SUBJECT PHONE utilized a cell tower and sector that provides cellular coverage to an area that includes 30 Hearth Road, Levittown, Pennsylvania (believed to be AINSLEY HUNTER's residence, and sometimes referred to in this affidavit as "30 Hearth Road").

---

[20] On May 25, 2019, the SUBJECT PHONE had at least 5 calls with CI-1, at the following times: 8:26 a.m., 8:35 a.m., 8:39 a.m., 6:34 p.m. and 8:40 p.m. (all Eastern time).  During the three morning calls, the SUBJECT PHONE utilized a cell tower and sector that provides cellular coverage to an area that includes 30 Hearth Road, Levittown, Pennsylvania (believed to be AINSLEY HUNTER's residence).  During the two evening calls, the SUBJECT PHONE utilized different cell towers in the Eastern District of Pennsylvania.

[21] Due to technical issues with the recording software, it is believed that some the calls have not been recorded.  In addition, in some of the recordings with HUNTER, HUNTER's voice is very difficult to hear.  CI-1 provided descriptions of those conversations to law enforcement believing that they had been recorded and that law enforcement could confirm their contents.

[22] The conversations occurred mostly in the Jamaican Patois language.  MOCA prepared translated transcripts, which I have reviewed.

a.  In the call on June 2, 2019, HUNTER asked if information he
previously told CI-1 was "gold" (i.e., if it was good information).  CI-
1 believed HUNTER was referring to the photo of Victim 1 that CI-1
received on May 25, 2019 from SUSPECT 1, and was asking if the
photo made it easier to identify Victim 1.  CI-1 told HUNTER that the
information was good and that he passed it on to the people who were
supposed to commit the murder.  In reality, CI-1 had not given the
photo to anyone, because CI-1 had not arranged for anyone to commit
the murders and did not have anyone surveilling Victim 1.

b.  In one of the calls on June 3, 2019, CI-1 told HUNTER that his
associates were not able to locate the man (referring to Victim 1) at
the church the previous week or the day before (Sunday June 2).
HUNTER stated he knows when Victim 1 is at the church and when
he is not, because he receives information from a man at the church.
HUNTER stated he would check with his source and call CI-1 back.
Approximately 90 minutes later, CI-1 and HUNTER spoke again and
had the following conversation, in part:

HUNTER:  Anyways, what I am saying to you is that, the man that I am getting the
information from is not wrong because they know each other like that.  It is not
like they do not know each other.  So, I am trying to tell you that on Sunday of
last week, it was just the lady that he saw and it was the first that he was seeing

her in how much years.  He doesn't know why that man did not come because usually, that man doesn't miss anything.

CI-1:        The men are telling me that on Sunday, it was only the lady that they saw.

HUNTER:   No, they are wrong about last week that is what I am trying to tell you.  The man said; that man was there.  He brought her lunch.  That is what I am trying to tell you.  So last week, they were wrong and this week, they are right.  Because the man even told me how the wife reach to church and even how she reach this week.

CI-1:        The guys said that the children were with her last week.

HUNTER:   Was it a girl and a little boy?

CI-1:        Yeah, that is what I am asking you because they are saying the man did not come to church last week.

HUNTER:   No, man.  You see what happen?

CI-1:        Okay, let me tell you straight.  We can talk on this ok.  The guys said the man never come to church last week.  The man picked up the wife, and children.  The only reason nothing did not happen was because the children were with them.  You're hearing me?

HUNTER:   Alright.  What did he say?  Did he say he say he came through?  Or he was not there?

CI-1:        Yeah, he was not at church last week and he was not there any time this week.

HUNTER:   Well, let them say what they want or if they want to give up okay.  I really don't care about anybody you know.

15

CI-1:        I am not hearing you.  Your phone is breaking up again.

HUNTER:      I am saying, I really don't care about anybody you know.  I am not going to
             make the mistake like Scarface you know.

CI-1:        Alright, so that means anybody then?  Just take care of it?

HUNTER:      I don't care about anybody.  Guess what, it is just whatever, you understand me?
             I do not care about anybody.  So, what I am saying is alright, if it is those two
             then okay, but if not, anything is anything.

CI-1:        Okay, Okay, Okay.

HUNTER:      Well, if they feel they have a better day other than the weekend then, that is fine.
             That is the best thing that I have gotten that I know is a must at some point.  I am
             just sorry that they missed that chance because that chance was not supposed to
             be missed.

CI-1:        Yeah, but you know that these men are professionals.  They don't really miss,
             you get me?

HUNTER:      Right, and this is why you go about your business how you go about your
             business.  That is how it goes.  Everyone goes about their business.

             20.     Based on my training and experience and my involvement in this
investigation, I believe that, in this call, HUNTER was expressing his frustration that CI-1's
associates had missed an opportunity to act the previous weekend.  I also believe that CI-1 was
saying that his associates did not take any action against Victim 1 and his wife the previous
week because their children were present.  I believe that HUNTER's statements "I don't care

about anybody" and "if it is those two then okay, but if not, anything is anything" mean that he does not care if CI-1's associates harm the children.[23]

      21.    After this conversation on June 3, 2019, CI-1 continued to stall over the next 3 weeks. CI-1 and HUNTER spoke on the phone multiple times during this period. Towards the end of June, CI-1 told HUNTER that he would need more money. HUNTER agreed to pay CI-1 more money.[24]

      22.    On June 27, 2019, the following events occurred:

          a.    At approximately 11:09 a.m. Jamaica time (1 hour behind Eastern time), HUNTER sent CI-1 a text stating "Noon." A few minutes later, CI-1 responded with texts stating "Same place," "Black shirt," and providing a password, meaning that the meeting should take place at the same KFC where the May 22 money exchange occurred, and

---

[23] I believe HUNTER's statement "I am not going to make the mistake like Scarface" is a reference to the 1983 film *Scarface*, starring Al Pacino as brutal drug lord Tony Montana. In that film, Montana's drug associate (Sosa) instructs him to help murder a man by detonating a car bomb. When Montana sees the intended victim get into the car with his wife and children, Montana refuses to carry out the murder and instead kills the man who was going to detonate the bomb. This leads to a war between Montana and Sosa, which results in Montana's death.

[24] According to CI-1, during one of the calls leading up to this payment, HUNTER stated he would need to check with unnamed other people for confirmation to pay CI-1 more money. HUNTER later said some people didn't agree with paying more money, since nothing had been done. Prior to this time, HUNTER had never mentioned any "others" or an organization to CI-1. To CI-1's knowledge, the only other person involved was SUSPECT 1. At this time, agents do not know whether or not HUNTER spoke to other people about whether CI-1 deserved this payment. However, agents do believe that HUNTER communicated with someone to arrange the payment from UNSUB 2 to CI-1.

that CI-1 would again be sending an associate who would be wearing a black shirt and would ask for a password (according to CI-1, he just wanted HUNTER to believe that the person collecting the money was not CI-1).  HUNTER replied "Yes."

b.    At approximately 12:38 p.m., CI-1 called HUNTER and stated he would arrive in 10 minutes.[25]  Shortly thereafter, MOCA law enforcement officers brought CI-1 to the KFC and conducted surveillance of the meeting.

c.    A MOCA law enforcement officer observed CI-1 meet with a male outside of the KFC, and the male handed CI-1 an envelope. According to CI-1, this male was the same UNSUB 2 from the May 22 meeting, and UNSUB 2 stated that the envelope contained $150,000 JMD (CI-1 stated he had expected to receive $200,000 JMD).  The envelope was later found to contain $150,000 JMD. MOCA collected the money as evidence.

d.    A MOCA law enforcement officer followed UNSUB 2 and observed him get into a black Toyota Passo, Jamaican license plate 6095GS, and drive away.  MOCA determined that the license plate is registered

---

[25] Cell site information for the SUBJECT PHONE indicates that, at the time of this call, the SUBJECT PHONE utilized a cell tower in the Bucks County, Pennsylvania area.

to AINSLEY LLOYD HUNTER at an address in Montego Bay, Jamaica.

e.     Following the meeting, at approximately 2:24 p.m. Jamaica time, CI-1 texted HUNTER "150." At approximately 2:41 p.m., HUNTER replied "Kool."

f.     Agents have obtained historical cell site information, a pen register/trap and trace device with prospective cell site information, and Precision Location Information (referred to commonly as "GPS ping data") for the SUBJECT PHONE for various dates. That data is described in more detail later in this affidavit. The GPS ping data for the SUBJECT PHONE indicates that, during the time period of the communications between CI-1 and the SUBJECT PHONE on June 27, 2019, the SUBJECT PHONE was in various areas of Bucks County, Pennsylvania. From the early morning hours until approximately 12:30 p.m. Eastern time (1 hour ahead of Jamaica), the ping data placed the SUBJECT PHONE in an area that includes 30 Hearth Road, Levittown, Pennsylvania. Beginning at approximately 12:45 p.m., the ping data showed the SUBJECT PHONE moving around to several locations in the Bucks County area. At approximately 4:02 p.m., the SUBJECT PHONE again began pinging in an area that includes 30 Hearth Road (where the phone remained for the rest of the evening). Based on my training and experience, I

19

believe this phone activity indicates that the user of the SUBJECT PHONE went out for a few hours, then returned home sometime around 4:02 p.m. At approximately 4:05 p.m., I drove past 30 Hearth Road and observed a black male in a wheelchair entering the front door of the house. Although I could not see his face, based on the context provided in this affidavit, I believe this male was AINSLEY HUNTER.

23.    Between June 28, 2019 and July 9, 2019, CI-1 and HUNTER exchanged occasional text messages. According to CI-1's understanding of the messages during this time period, HUNTER was expressing frustration that the murders had not been committed. On July 9, 2019, HUNTER texted CI-1 "Keep on wasting time until time run out." CI-1 interpreted this message as a threat to CI-1.

24.    On July 12, 2019, sometime between 4:22 a.m. and 4:37 a.m., the SUBJECT PHONE stopped generating GPS ping data (the last location was in an area that includes 30 Hearth Road in Levittown). Based on my training and experience, I know that GPS ping data will not be generated if the phone is powered off. The next GPS ping data was generated later that day, at approximately 3:08 p.m. Eastern time, at which time the SUBJECT PHONE was located in the Phoenix, Arizona area (the local time was approximately 12:08 p.m.). Based on my training and experience, I believe this activity indicates that the user of the SUBJECT PHONE flew to Phoenix, and had the phone shut off during the flight. The phone remained in the Phoenix area until at least July 16, 2019, at which time the SUBJECT PHONE again stopped generating GPS ping data. The SUBJECT PHONE did not generate GPS ping

20

data again until July 24, 2019, at which time the phone was located in the Bucks County area (in an area that includes 30 Hearth Road in Levittown).

25.     The pen register/trap and trace data indicates that, between July 24 and July 26, 2019, the SUBJECT PHONE sent three messages to CI-1 and placed eight phone calls to an 800 number for a third party international calling service, which HUNTER uses to call CI-1 (explained in more detail later in this affidavit).[26]  All of these calls and texts utilized a cell tower and sector that provides cellular coverage to an area that includes 30 Hearth Road.  In a July 26 text message exchange between CI-1 and HUNTER, CI-1 told HUNTER that his men had not seen Victim 1 lately.  HUNTER wrote "Get the job done or return the contract and dont tell me no bull shit."

26.     CI-1 also stated that, during the numerous conversations between HUNTER and CI-1, HUNTER gave the following additional information to CI-1: (a) HUNTER told CI-1 that he had been looking for someone who could do work like this in a "clean" manner, and that once the murders were committed CI-1 and HUNTER could do additional business together (which CI-1 understood to mean additional murders); (b) originally, HUNTER told CI-1 that Victim 1 drove a silver car.  On approximately May 28 or May 29, 2019, HUNTER told CI-1 that Victim 1 got a new car – a two-door black Audi.  HUNTER stated he learned this from his contact at the church; and (c) HUNTER told CI-1 that Victim 1's wife had

_____

[26] CI-1 also sent text messages to HUNTER, but the incoming text messages do not generate cell tower data for the SUBJECT PHONE in the pen register/trap and trace data.

approximately 5 children. When HUNTER said this, CI-1 heard HUNTER speaking to someone in the background in an effort to confirm the number of children.

### Information from Victim 1

27.     Based on CI-1's information, MOCA identified Victim 1 and notified him of the threat against him. Victim 1 stated that he suspected AINSLEY HUNTER was the person who wanted him killed, and that HUNTER tried to have him harmed in the past. Victim 1 informed agents that he has known HUNTER for approximately 17 years and that he used to work for HUNTER in Jamaica. During much of that time, HUNTER was in the United States, and Victim 1 would help HUNTER run several properties and businesses that HUNTER owned in Jamaica. Among other tasks Victim 1 performed for HUNTER, Victim 1 would meet with people and accept money from them, which Victim 1 would store in a safe for HUNTER in Jamaica. In 2017, HUNTER told Victim 1 to pick up women from the airport. One of the women came out, but the others could not leave the airport. The woman who came out of the airport gave Victim 1 approximately $10,000 USD, which Victim 1 put in HUNTER's safe. Victim 1 learned that a woman who HUNTER described as his wife was arrested that day at the airport (that woman is referred to herein as "Individual 1"). Victim 1 believes HUNTER suspects him of cooperating with law enforcement regarding this incident, and as a result has tried to have Victim 1 harmed since that time.

28.     Victim 1 stated that HUNTER was in an accident at some point and was in the hospital. Victim 1 has not seen HUNTER in person since the accident; all contact was over the phone or through video chat, where Victim 1 could only see HUNTER's upper body.

Victim 1 has been told that HUNTER is in a wheelchair. When Victim 1 worked for HUNTER, Victim 1 drove a black Toyota Passo that belonged to HUNTER. Victim 1 believes that a male, who he identified by name, has taken Victim 1's place working for HUNTER.[27] Victim 1 told MOCA that he does not know exactly where HUNTER lives, but that HUNTER used to talk about Philadelphia. Victim 1 learned that HUNTER had a Jamaican passport with Victim 1's name but HUNTER's photo.

        29.      Regarding the incident Victim 1 mentioned from 2017, I have reviewed an HSI report describing a money seizure by the Jamaica Customs Agency (JCA) on September 28, 2017 at the airport in Montego Bay. On that date, JCA stopped four women who were traveling into Jamaica together. One of the women was Individual 1 (who HUNTER described as his wife to Victim 1) – the JCA seized more than $9,000 USD in cash from Individual 1, along with 10 checks valued at more than $86,000 USD. The JCA seized $100,000 USD in cash from one of the other women. A fifth woman traveling with them left the airport before the JCA could stop her. The report notes that Victim 1 is believed to be the person who picked up the fifth woman at the airport. The report states that AINSLEY HUNTER was believed to be

---

[27] Agents believe the male identified by Victim 1 may be UNSUB 2, who met with CI-1 at the KFC in Montego Bay on May 22, 2019 and June 27, 2019. Agents obtained a photo of the male identified by Victim 1 and compared it to surveillance video images of UNSUB 2 from May 22. They appear to be the same person. In addition, if this male took over Victim 1's position working for Hunter, I believe it makes sense that HUNTER would send him to meet with CI-1 regarding money, just as HUNTER had Victim 1 meet with people regarding money. I also note that, on June 27, UNSUB 2 was driving a black Toyota Passo that was registered to HUNTER, which is a car that Victim 1 drove while working for HUNTER.

the person behind the importation of the currency.  The report also states that a woman who did

not travel with the group (referred to herein as "Individual 2") was suspected of being the person

who purchased the tickets for the three of the women.  Individual 2 also purchased one of the

checks that was seized from Individual 1.

AINSLEY HUNTER and SUSPECT 1

30.     Based on the above and other facts listed in this affidavit, I submit there is

probable cause to believe that AINSLEY HUNTER is the person who has been attempting to

arrange the murder of Victim 1 and his wife in Jamaica.  Agents have identified the man CI-1

was communicating with as AINSLEY HUNTER, date of birth in August 1969.  Agents have

confirmed that HUNTER was involved in a car accident that left him paralyzed from the hips

down, which is consistent with the information SUSPECT 1 told CI-1 about the man he was

communicating with in the United States and the information Victim 1 was told about

HUNTER.  Further, during the incident that left HUNTER paralyzed, HUNTER was using a

driver's license in Victim 1's name (but with HUNTER's photo).

31.     A criminal history check for SUSPECT 1 revealed that, in 2005,

SUSPECT 1 was charged with Conspiracy to Distribute a Controlled Substance and Possession

with Intent to Distribute a Controlled Substance (Cocaine) in the Eastern District of

Pennsylvania.  The indictment listed an alias for SUSPECT 1, which is the nickname CI-1 knew

SUSPECT 1 to go by.  He was convicted in 2006 and sentenced to 46 months imprisonment.  In

2008, he was transferred to Canada to serve the remainder of his sentence, and he was deported

from the United States.

32.     A criminal history check revealed that, in 1995, HUNTER was charged with Conspiracy to Distribute a Controlled Substance (Cocaine) in the Eastern District of Pennsylvania. HUNTER was convicted in 1996 and sentenced to 70 months imprisonment. HUNTER was incarcerated in the United States until 1998, then was deported to Jamaica. At some point, he illegally re-entered the United States. On April 13, 2005, he was arrested by immigration agents outside 30 Hearth Road, Levittown, Pennsylvania. He was subsequently charged and convicted in federal court in the Eastern District of Pennsylvania for illegal re-entry, and sentenced to 21 months imprisonment. HUNTER was incarcerated in federal prison from April 14, 2005 until October 20, 2006. He was subsequently deported to Jamaica again. At some point, he again illegally re-entered the United States. On June 11, 2008, HUNTER was arrested in Inglewood, California and charged with a drug offense (acquisition of narcotics sale proceeds). HUNTER identified himself by an alias name, referred to herein as "D.D.." (HUNTER possessed a Pennsylvania driver's license in the name of D.D.). Fingerprint checks later revealed that D.D. was really HUNTER. On February 4, 2009, HUNTER was traffic-stopped in Arizona by the Arizona Department of Public Safety ("DPS"). During a consent search of HUNTER's car, DPS officers discovered approximately 2 kilograms of cocaine. HUNTER then fled the traffic stop and crashed his car, which caused severe injuries and left him paralyzed from the hips down. At the time, HUNTER was using a Florida driver's license in Victim 1's name, but with HUNTER's photo. Fingerprint checks later revealed HUNTER's true identity. HUNTER was convicted of a drug offense in Arizona and sentenced to 3.5 years imprisonment. Following his jail sentence, HUNTER was not deported as an administrative matter, due to humanitarian reasons.

25

33.     CI-1 stated that SUSPECT 1 told him that he and HUNTER were

incarcerated together.  Records from the United States Bureau of Prisons ("BOP") indicate that,

between September 29, 2005 and April 24, 2006, SUSPECT 1 and HUNTER were incarcerated

in the same unit of the Philadelphia Federal Detention Center ("FDC").[28]


Phone Data

34.     Based on the information about the threat to the lives of Victim 1 and his

wife, on June 11, 2019, agents obtained phone records for the SUBJECT PHONE pursuant to a

subpoena and the emergency disclosure provision of 18 U.S.C. § 2702(b).[29]  On June 25, 2019,

agents obtained a search warrant in the Eastern District of Pennsylvania authorizing the seizure

of historical cell site information, Pen Register/Trap and Trace device data with cell site

information and prospective GPS "ping" data for the SUBJECT PHONE.  Agents renewed that

search warrant on July 25, 2019.  In total, agents have received the following information about

the SUBJECT PHONE: (1) subscriber data; (2) call detail records with cell site information

---

[28] HSI's summary of the initial interview with CI-1 indicates that SUSPECT 1 told CI-1 that he and HUNTER were cellmates.  BOP records do not indicate that SUSPECT 1 and HUNTER were ever cellmates; however, they were incarcerated in the same unit of the FDC.  From my training and experience, I know that inmates who are in the same unit at the FDC are able to spend the majority of their waking hours together in a communal area.

[29] The initial records were obtained by agents in the FBI Los Angeles office based on the fact that SUSPECT 1 told CI-1 that the man in the United States (HUNTER) lived in California. After the initial records showed that the SUBJECT PHONE was consistently in the Philadelphia area, agents in the FBI Philadelphia office became involved and obtained the subsequent search warrants.

from May 20, 2019 through July 30, 2019;[30] (3) Verizon Wireless Real Time Tool ("RTT") records from June 3, 2019 until June 11, 2019, which provide estimates of the phone's location at various points in time based on the amount of time it takes for a signal to make a round-trip from a cell tower to the phone and back again; and (4) Precision Location Information data, which provides an estimate of the phone's location at various points in time based on "GPS ping data" and cell tower multilateration data (i.e., an estimate of the phone's location based on data from multiple cell towers).[31] In this case, GPS ping data has been received every 15 minutes during the following time periods: June 11, 2019 at approximately 4:00 p.m. to June 13, 2019 at approximately 4:00 p.m.; June 26, 2019 at approximately 2:00 p.m. to July 25, 2019 at approximately 12:00 a.m.; and July 25, 2019 at approximately 2:46 p.m. through July 30, 2019 (all times listed in Eastern time).[32]

        35.     The phone records reveal the following.

---

[30] For communications between May 20, 2019 and May 24, 2019, agents have received call detail records showing the date, time, duration, and calling/called numbers for phone calls and text messages, but have not yet received cell site information.

[31] RTT estimates and Precision Location Information/GPS ping data estimates come with a range of uncertainty and are not necessarily linked to any particular phone call, text message or other communication transaction. In this case, the GPS ping data estimates that placed the SUBJECT PHONE in an area that includes 30 Hearth Road typically had a range of uncertainty of slightly more than 1 mile. However, (1) the center of that radius was typically approximately one-quarter mile from 30 Hearth Road; and (2) I believe that, when viewed in combination with the other circumstances described in this affidavit, the data indicates that the SUBJECT PHONE was located at 30 Hearth Road when the GPS ping data placed it in that area.

[32] Agents have continued to receive data for the SUBJECT PHONE after July 30. For purposes of data analysis in this affidavit, July 30 was selected as an end point.

a.    The SUBJECT PHONE is assigned to Verizon Wireless. It is a
prepaid phone that was activated on May 20, 2019 (the day before CI-
1 first spoke with HUNTER). The phone was purchased on May 20,
2019 at a Target store located at 2331 Lincoln Highway, Langhorne,
Pennsylvania, which is approximately 2 miles from 30 Hearth Road,
Levittown, Pennsylvania.[33]

b.    The subscriber of the SUBJECT PHONE is listed as "Anthony
Johnson" at an address in Philadelphia, Pennsylvania. As mentioned
above, HUNTER was arrested by immigration agents on April 13,
2005. A police report from the incident indicates that HUNTER was
driving a car registered to Individual 2. Police contacted Individual 2
and she stated that she had known HUNTER since June 2004, and
that he told her his name was "Tony Johnson."

c.    The SUBJECT PHONE began making and receiving calls on May 21,
2019. Between May 21, 2019 and July 30, 2019, the SUBJECT
PHONE only made calls to and received calls from: (1) CI-1's phone
number; and (2) "1-800" phone numbers connected to a third party
international calling service, which allows users to place international
phone calls at cheaper rates than if the call was placed directly

---

[33] Target has provided records indicating the phone was purchased with cash.

28

through the user's cellular provider.[34]  Based on my training and experience, this kind of activity is consistent with the use of a "burner" phone, which is how HUNTER described the SUBJECT PHONE to CI-1.

    d.    The SUBJECT PHONE first had contact with CI-1's phone on May 21, 2019, including a call that lasted more than 10 minutes.  On May 22, 2019 (the date when CI-1 received money from UNSUB 2 at the KFC), the international calling service's records indicate the SUBJECT PHONE called CI-1 at approximately 2:22 p.m. Jamaica time (which was one hour behind Eastern time).  The Verizon records show that the SUBJECT PHONE then received six calls from CI-1's phone number and made one call directly to CI-1's phone number (not through international calling service) between 3:55 p.m. and 4:49 p.m. Jamaica time.  As stated above, the surveillance video timestamp

---

[34] There were a handful of additional numbers in the phone records, which are believed to be routing numbers or administrative numbers used by Verizon. Regarding the third party international calling service, in summary, the user calls the service's 800 number, then enters the international phone number he/she wants to call. The Verizon phone records do not indicate what numbers HUNTER called when placing calls through this service. Records provided by the international calling service indicate that, between May 22, 2019 and June 24, 2019, the SUBJECT PHONE made 12 outgoing calls through the service, and all of those calls were to CI-1's number. However, the Verizon records for the SUBJECT PHONE show more than 12 outgoing calls to the service's 800 number. Based on conversations with a representative of the service and a review of the duration of the calls, it is likely that the SUBJECT PHONE called the 800 number multiple times but did not actually complete a call to another phone number (in which case no call would appear on the service's records).

indicated that the meeting occurred at approximately 4:25 p.m. Jamaica time.

e.    The RTT data from June 3, 2019 through June 11, 2019 indicates that the SUBJECT PHONE was frequently in an area of Bucks County, Pennsylvania. One of the addresses in that area is 30 Hearth Road, Levittown, Pennsylvania.

f.    The GPS ping data also shows that the SUBJECT PHONE was frequently in an area that includes 30 Hearth Road. In fact, on every date for which GPS ping data has been provided (other than the dates when the phone was in Phoenix), the GPS ping data shows that the SUBJECT PHONE was in an area that includes 30 Hearth Road during the late night, overnight and early morning hours.[35] Based on my training and experience, I believe this activity indicates that the user of the SUBJECT PHONE resides in the area of 30 Hearth Road.

36.    As described above, GPS ping data showed that the SUBJECT PHONE traveled from the Philadelphia area to the Phoenix area on July 12, 2019. Based on this, agents attempted to determine if HUNTER flew from Philadelphia to Phoenix on that date. Investigation revealed that HUNTER did fly from Philadelphia to Phoenix on July 12, 2019,

---

[35] The SUBJECT PHONE did not generate any GPS ping data from June 29, 2019 at approximately 10:30 p.m. until July 3, 2019 at approximately 7 p.m., and again from the period of July 16, 2019 to July 24, 2019 mentioned above.

using the identity of a man identified herein as "K.H." Upon learning of the use of this identity

by HUNTER, agents subsequently located an Arizona identification card in K.H.'s name,

bearing HUNTER's photo.[36] Agents have also obtained records showing that HUNTER has

traveled frequently utilizing the K.H. identity.

      37.     Agents obtained surveillance video showing that, while traveling from

Philadelphia to Phoenix on July 12, HUNTER possessed at least five smartphone-style cell

phones, plus a phone that appears to be a flip-phone style cell phone. That phone appears to be

grey/silver around the edges, with a black rectangle in the middle. I know through investigation

that the SUBJECT PHONE is a ZTE model Z233VL phone. I have reviewed stock images of

that model of phone, which indicate it is a flip-phone with grey/silver around the edges and a

black rectangle in the middle. Thus, I have concluded that HUNTER was in possession of the

SUBJECT PHONE.

      38.     On July 30, 2019, agents monitored the GPS ping data and observed that,

from the morning until approximately 1:00 p.m., the SUBJECT PHONE was located in an area

that includes 30 Hearth Road, Levittown, Pennsylvania. At approximately 1:09 p.m. and 1:24

p.m., the GPS pings indicated that the SUBJECT PHONE was moving toward Center City

---

[36] I have compared the photo from the Pennsylvania driver's license in the name of D.D. used in
HUNTER's 2008 California arrest, the photo from the Florida driver's license in Victim 1's
name located during HUNTER's 2009 arrest, the photo from the Arizona identification card in
the name of K.H. used by HUNTER to travel to Arizona in July 2019, and known photos of
HUNTER. I believe they are all the same person (HUNTER). The D.D. license is still a valid
Pennsylvania license, and features an updated photo of HUNTER that was taken on September
7, 2016. The K.H. identification card was issued on November 20, 2014, and is still a valid
Arizona identification card.

Philadelphia. At 1:39 p.m. and 1:54 p.m., the GPS pings indicated that the SUBJECT PHONE

was located in an area that includes an address in the 600 block of South Street, which I know

is an address associated with a woman who is believed to be AINSLEY HUNTER's daughter.

At approximately 2:00 p.m., I drove past that address in the 600 block of South Street and

observed a white Volvo SUV parked in front. The license plate of that white Volvo SUV is

registered to the woman who is believed to be HUNTER's daughter. At approximately 2:02

p.m., I observed the car drive north on 5th Street and turn west on Lombard Street. Shortly

thereafter, I was able to see a black female in the driver's seat and a black male in the front

passenger seat. I observed the car drive west approximately 9 blocks and turn south on Broad

Street, at which time contact with the car was lost. At approximately 2:09 p.m., the GPS ping

data showed that the SUBJECT PHONE was located in a different area from the ping data at

1:54 p.m., indicating that the phone had likely moved between those times (consistent with my

observation of the movement of the white Volvo). At approximately 2:23 p.m., I observed the

white Volvo parked in the 900 block of South Street, with nobody in the driver's seat (I could

not tell if anyone was in the passenger's seat). At approximately 2:24 p.m., the GPS ping data

indicated that the SUBJECT PHONE moved again, and was now pinging in the same area as

the 1:39 p.m. and 1:54 p.m. pings (an area that includes both the 900 block of South Street and

the 600 block of South Street). Contact with the vehicle was lost shortly thereafter. The GPS

ping data indicated that the SUBJECT PHONE was located in Center City Philadelphia until at

least 6:09 p.m. At approximately 6:24 and 6:39 p.m., the GPS pings indicated that the

SUBJECT PHONE was moving northeast, towards Bucks County. At approximately 6:52

p.m., agents observed the white Volvo arrive at 30 Hearth Road and park in the driveway, with

a black female in the driver's seat and a black male in the front passenger seat. Agents

observed the driver retrieve a wheelchair from the trunk of the car and bring it to the passenger

side. Shortly thereafter, agents observed the black male who had been in the passenger seat of

the car wheeling himself into the house through the front door, using the wheelchair. At

approximately 6:54 p.m., the ping data indicated that the SUBJECT PHONE was now located

in an area that includes 30 Hearth Road. The black female drove away from 30 Hearth Road in

the white Volvo at approximately 7:02 p.m. The GPS ping data indicated that the SUBJECT

PHONE remained in the same area for the remainder of the night. Based on these observations,

I believe that the male in the wheelchair was AINSLEY HUNTER. I also believe that the

combination of the phone data and surveillance observations indicate that HUNTER possessed

the SUBJECT PHONE, since the SUBJECT PHONE appeared to move along with HUNTER's

movements (and did not leave the area that included 30 Hearth Road when the white Volvo

departed).

        39.    Based on the above, I submit there is probable cause to believe that, in

violation of 18 U.S.C. § 956(a)(1), AINSLEY HUNTER, while in the jurisdiction of the United

States, has conspired with SUSPECT 1 and others known and unknown to commit the murder

of Victim 1 and his wife in Jamaica, and that HUNTER has committed an act within the

jurisdiction of the United States to effect an object of the conspiracy. Specifically, there is

probable cause to believe that HUNTER has committed the following acts, among others:

        a.    On or about May 22, 2019 and June 27, 2019, HUNTER arranged for

             UNSUB 2 to meet with CI-1 in Jamaica and pay him money that

             would further CI-1's efforts to have Victim 1 and his wife killed. In

order to accomplish this, HUNTER must have communicated with UNSUB 2 in some way on those dates. On June 27, 2019, the SUBJECT PHONE (believed to be used by HUNTER) was accessing cell towers in the Eastern District of Pennsylvania (including a cell tower and sector that provides cellular coverage to an area that includes 30 Hearth Road, Levittown, Pennsylvania)[37];

b.  On or about May 25, 2019, HUNTER sent or caused someone else to send a photo of Victim 1 to CI-1, for the purpose of making it easier for CI-1 to identify Victim 1 in Jamaica and have him killed. On that date, the SUBJECT PHONE (believed to be used by HUNTER) was accessing cell towers in the Eastern District of Pennsylvania (including a cell tower and sector that provides cellular coverage to an area that includes 30 Hearth Road, Levittown, Pennsylvania);

c.  On June 3, 2019, during telephone calls with CI-1, HUNTER provided CI-1 with information about when Victim 1 and his wife were and were not at their church, for the purpose of making it easier for CI-1 to locate Victim 1 and his wife in Jamaica and have them killed. At the times of those calls, the SUBJECT PHONE (believed to be used by HUNTER) was accessing a cell tower and sector in the

---

[37] Agents have not yet received the SUBJECT PHONE's historical cell site information for May 22, 2019.

Eastern District of Pennsylvania that provides cellular coverage to an

area that includes 30 Hearth Road, Levittown, Pennsylvania.


Social Security Fraud and Aggravated Identity Theft

40.     Under 42 U.S.C. § 408(a)(7)(B), it is a felony for someone, for any

purpose and with intent to deceive, to falsely represent a particular social security account

number to be his.  A person commits a felony violation of 18 U.S.C. § 1028A if, during and in

relation to a violation of 42 U.S.C. § 408(a)(7)(B), he knowingly transfers, possesses, or uses,

without lawful authority, a means of identification of another person.

41.     As stated above, HUNTER currently possesses a Pennsylvania driver's

license in the name of D.D.  HUNTER used this identity and driver's license when he was

arrested in Inglewood, California on June 11, 2008.  This license was issued on August 31,

2016 and is set to expire on July 17, 2020.  A review of the photograph associated with this

driver's license appears to be HUNTER.

42.     D.D. is a real person (who is not HUNTER), who appears to live in New

York.  Agents determined that the "real" D.D. possessed a state of New York identification

card.  I reviewed a photograph for D.D. associated with this identification card and there is no

resemblance to the above-mentioned photographs of HUNTER.  SSA-OIG (the law

enforcement arm of the Social Security Administration) has confirmed for me that the date of

birth and social security number (SSN) associated with that New York identification card are

the real D.D.'s date of birth and SSN.  The SSN ends in 6301.

43.     In June 2019, I queried the Pennsylvania Justice Network (JNET) for any available driving records for HUNTER. This query confirmed a driver's license in the name of AINSLEY HUNTER with a date of birth in August 1969, an address in Philadelphia, Pennsylvania and a driver's license number of 22679754. The license was issued on October 27, 1992 and expired on August 31, 1996. The status of the license was "revoked, suspended, cancelled or recalled." A review of the photograph associated with this driver's license appeared to be HUNTER.

44.     Agents have reviewed the supporting documents and applications for the above-mentioned D.D. driver's license from the Pennsylvania Department of Transportation (PENNDOT). The investigation revealed that HUNTER applied for or renewed a Pennsylvania Identification Card and/or a driver's license on multiple dates. The original identification card was issued pursuant to an application filed on May 21, 2004. In this application, HUNTER provided D.D.'s name, date of birth and SSN ending in 6301, purporting it to be his own personal information. Since that original application, HUNTER has received renewal identification cards and/or driver's licenses several times, including on February 20, 2008, April 21, 2008, January 9, 2013, January 29, 2013, and August 31, 2016. All of these forms of identification are tied to the use of D.D.'s name, SSN, and DOB. I have viewed the photographs for all cards tied to D.D.'s name, SSN, and DOB issued by PENNDOT, and have identified all as HUNTER. The most recent renewal by HUNTER in D.D.'s name was processed at the PENNDOT Granite Run location, 1067 West Baltimore Pike, Media, Pennsylvania, which is located in the Eastern District of Pennsylvania.

36

45.     The PENNDOT records also show that HUNTER presented a New York birth certificate and a social security card in the name of D.D. as supporting documentation for one of the licenses.  For all of these respective applications or renewals, I have reviewed the corresponding photographs and identified them as HUNTER.

46.     Based on these facts, I believe probable cause exists that HUNTER, in order to evade detection by law enforcement and with intent to deceive, has falsely represented to PENNDOT that the social security number ending in 6301 belongs to him, in violation of 42 U.S.C. § 408(a)(7)(B).  I further believe that probable cause exists that, during and in relation to this violation of 42 U.S.C. § 408(a)(7)(B), HUNTER has knowingly possessed and used, without lawful authority, a means of identification for D.D. (specifically a name, date of birth and social security number), in violation of 18 U.S.C. § 1028A.

## **CONCLUSION**

47.     Based on the foregoing, I submit that probable cause exists to believe that

AINSLEY HUNTER has committed violations of 18 U.S.C. § 956(a)(1) (conspiracy to murder

in a foreign country), 42 U.S.C. § 408(a)(7)(B) (social security fraud), and 18 U.S.C. § 1028A

(aggravated identity theft), all in the jurisdiction of the Eastern District of Pennsylvania.

Respectfully submitted,

Matthew Yaeger
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on August _____, 2019

HONORABLE LINDA K. CARACAPPA
United States Magistrate Judge

38